IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 26, 2013

**GARY THOMAS REED v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Cumberland County**
**No. 08-0107A     Leon C. Burns, Jr., Judge**

_____

**No. E2013-00169-CCA-R3-PC - Filed August 30, 2013**

_____

A Cumberland County jury convicted the Petitioner, Gary Thomas Reed, of initiating the process of manufacturing methamphetamine. This Court affirmed the Petitioner's conviction and sentence on appeal. *State v. Gary Thomas Reed*, No. E2009-02238-CCA-R3-CD, 2011 WL 1842711 (Tenn. Crim. App., at Knoxville, Aug. 24, 2011), *perm. app. denied* (Tenn. Aug. 24, 2011). The Petitioner timely filed a petition for post-conviction relief claiming that he had received the ineffective assistance of counsel. The post-conviction court denied relief after a hearing. On appeal, the Petitioner claims that his attorney failed to call an exculpatory witness at trial and failed to object to a violation of the sequestration rule. After a thorough review of the record, the briefs, and relevant authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Jeffrey A. Vires, Crossville, Tennessee, for the Appellant, Gary Thomas Reed.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall A. York, District Attorney General; and Amanda M. Hunter, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I. Facts**

## A. Trial

A Cumberland County jury convicted the Petitioner of initiating the process of manufacturing methamphetamine, a Class B felony. On direct appeal, this Court provided the following summary of the facts presented at trial:

Investigator Jeff Slayton of the Cumberland County Sheriff's Department testified that he had participated in approximately 20 methamphetamine laboratory investigations in the past year. As a part of Investigator Slayton's training for his position, he completed a course on clandestine laboratory safety through the Drug Enforcement Administration. In this course, he "learned what components were used to manufacture methamphetamine and how those components combined actually produced meth." He also "learned how to safely investigate clandestine laboratories, how to go in and dismantle one so it could be cleaned up by hazardous material groups."

Investigator Slayton testified that after receiving some indication that a methamphetamine laboratory was present on a property located on Lynch Road, he and his team began surveillance of the property on June 3, 2008. There were "several abandoned trailers" parked on the property that appeared to be uninhabited, but there was also another trailer located on the property that the Defendant appeared to be living in. Jerry King owned the property and the inhabited residence. While there was no electricity supplied by the utility district, there was a generator located at the back of the residence. However, the water from the utility district had been connected using the Defendant's name. Everett Bolin, Jr., of the Crab Orchard Utility District testified that the "meter-reading history report" for the property on Lynch Road reflected that the Defendant requested water for the property in his name on June 5, 2008. The last reading of the meter was made on September 12, 2008.

Investigator Slayton testified that he and other members of his team stayed at the property observing the residence from the woods "in the nighttime hours" until the "early morning hours" as a part of their surveillance. While Investigator Slayton was not physically staying on the property every day, the surveillance team utilized cameras to record the activities on the property. When Investigator Slayton was present, he was able to identify the Defendant and "numerous individuals that were entering and leaving" the residence. However, the Defendant was the person he "viewed most often entering and leaving" the residence. The Defendant spent the night at the

residence and was observed "riding a four-wheeler" and "doing something with some equipment outside of the residence" on the property.

On June 25, 2008, a warrant was obtained to search the residence. Based upon the surveillance of the residence, Investigator Slayton believed there would be "anywhere from 12 to possibly 16 people at that residence" when they executed the search warrant. Several hours before they entered the residence, Investigator Slayton observed the Defendant "continually go to a back bedroom" inside the residence. When they entered the residence, there were 13 people present, including the Defendant and his co-defendant, Jessica Hale. FN1

> FN1. She pled guilty to attempt to manufacture methamphetamine and received a six-year sentence, suspended to probation.

Sergeant Rick Lanzilotta of the Cumberland County Sheriff's Department testified that he participated in the execution of the search warrant on the property located on Lynch Road on June 25, 2008. When he entered the residence, he proceeded to the back bedroom. As he approached the bedroom, the Defendant slammed the bedroom door in his face. After Sergeant Lanzilotta broke the door down, he arrested the Defendant.

Investigator Casey Cox of the Cumberland County Sheriff's Department testified that he had been involved with 85 to 90 percent of the methamphetamine laboratory investigations in Cumberland County and that all of his training and certifications have enabled him to properly investigate such cases. He stated that a person can manufacture methamphetamine in more than one way but that in Cumberland County, he found that red phosphorus laboratories were more popular. Investigator Cox explained that red phosphorous laboratories manufacture methamphetamine using ephedrine or psuedoephedrine, iodine crystals, and red phosphorous. He stated that the most important ingredient in the process is ephedrine or psuedoephedrine because it is the only ingredient in the manufacturing process that must be present.

As relevant to this case, Investigator Cox stated that in order to use the most important ingredient, psuedoephedrine, the manufacturer must break the "binder away from the pill." The binder can be removed by mixing the tablet with Heet, which will dilute the pill, forming what is commonly called an

ephedrine wash. The ephedrine wash is then poured through a filtering system, which separates the binder from the liquified ephedrine. Generally, manufacturers use coffee filters to separate the binder. The resulting liquid can be stored in any type of container, such as a Mason jar.

Investigator Cox explained that the three ingredients, ephedrine, iodine crystals, and red phosphorous, are then "combined together and heated," creating a methamphetamine base. The methamphetamine base can be mixed with a solvent, such as camp fuel and then filtered to remove the methamphetamine crystals, the final product. Manufacturers may also create a gas using a homemade generating system and muriatic acid that will heat the base, causing the methamphetamine crystals to form. The base is then filtered, removing the crystals. The crystals can be whitened with acetone, which makes the crystals appear to have a higher concentration. The crystals are generally weighed and placed into small bags for selling purposes.

Investigator Cox participated in the investigation of the Defendant's case and collected the evidence found in the back bedroom of the residence. He found a black bag with pink lining on the bed. The bag contained a digital scale, a turkey baster, rubber gloves, a small container, a rubber stopper with green duct tape on top with a small hole in the top, rubber tubing, clear plastic tubing, pH strips, Mason jar lids, a bottle of Visine that contained muriatic acid, and a small glass pipe. In the plastic container with the pink lid, he found red phosphorous. He found coffee filters that appeared to be "damp" around the edges and a clear plastic bag that contained left-over red phosphorous.

Underneath the dresser in the bedroom, Investigator Cox found several four-quart Mason jars. The jars contained an ephedrine wash. One of the jars was a "pinkish-red color." He explained that the substance was a different color because the manufacturer had probably used a Sudafed pill, which contained a dye, to create the wash. He admitted that he was unable to conclusively determine when the ephedrine wash was created or how long the jars had been in the bedroom. He stated that the items found in the room were commonly used in the manufacturing process of methamphetamine and that the "only legitimate purpose" for the presence of the items was to manufacture methamphetamine.

Also inside the bedroom, he found a leaf blower, three or four chainsaws, a "toy bulldog" attached to the mirror, mail addressed to the Defendant, and a binder that contained paperwork and documents bearing the

Defendant's name. He stated that the Defendant was commonly referred to as "Bulldog."

Janice Hall testified for the Defendant and stated that she worked for the Defendant, who owned his own landscaping business. She stated that the Defendant lived on Moonlight Trail and that the property on Lynch Road was used to store his business equipment. Ms. Hall testified that she sold a black bag with pink lining to the co-defendant at a yard sale. Ms. Hall stated that she saw the co-defendant with the bag approximately two weeks before the Defendant was arrested. On cross-examination, she admitted that she had a child with the Defendant's brother.

Natasha Bowman testified that she also worked for the Defendant and that the Defendant was living on Moonlight Trail at the time of his arrest. She admitted that he stored his work equipment on the property on Lynch Road. She stated that everyone who worked for the Defendant met at the property on Lynch Road at the beginning of the day. She stated that on June 25, 2008, she had worked with the Defendant in Fairfield Glade before bringing the equipment back to the property on Lynch Road. She testified that Ms. Hall was her friend and that Ms. Hall sold her bag to the co-defendant, who was at the property on Lynch Road when they returned the equipment on June 25, 2008.

*Gary Thomas Reed*, 2011 WL 1842711, at *1-3.

The trial court sentenced the Defendant as a Range II, multiple offender to sixteen years in the Tennessee Department of Correction.

**B. Post-Conviction**

The Petitioner timely filed a post-conviction petition claiming that he received the ineffective assistance of counsel at trial. At the hearing on the petition, the parties presented the following evidence: Jessica Hale testified on behalf of the Petitioner and stated that on June 28, 2009, law enforcement searched her trailer and found items used for the manufacture of methamphetamine. As a result of the search and resultant discovery of these items, Hale pled guilty to manufacture of methamphetamine, and a trial court sentenced her to serve a six-year probation sentence.

Hale testified that the Petitioner was her ex-boyfriend. She said that he had lived with her "[o]n and off" in April and May 2008, but on June 25, 2008, he was living with Janice

Hall. She said that the Petitioner was unaware of the drug activity in her residence. When the Petitioner was arrested, Hale offered to testify on his behalf and assume all responsibility for the items law enforcement found. Hale said that she never spoke with the Petitioner's attorney ("Counsel").

On cross-examination, Hale agreed that she pled guilty before the Petitioner's trial. Hale admitted that she pled "no contest" to the charges and, on a court form requesting diversion, she wrote that the basis of the charges was her possession of a "friend's key chain" in which methamphetamine was found. The form also indicated that Hale had pending matters and refused to testify at the Petitioner's trial. Hale explained that she "should have marked that out" as incorrect. She denied refusing to testify at the Petitioner's trial and stated that she was "never given an option."

Hale testified that she spoke with law enforcement at the time of the search and denied ownership of the residence or items inside. She later spoke with Investigator Cox and again denied ownership of the drug-related items. Hale said that she "didn't know what [the Petitioner] was doing." She said that she did not remember telling Investigator Cox, during the same conversation, that the Petitioner's response to her desire to participate in rehabilitation was, "[y]ou better not turn state's evidence against [me]."

Hale clarified that she did not live in the trailer where the drug-related items were found but "by it." Hale said that she was aware that law enforcement had been conducting surveillance of the trailer for approximately a month before the search. She said she observed the Petitioner frequenting the trailer. She agreed that the Petitioner had stayed there "a few nights in a row." Hale maintained that all of the items associated with methamphetamine found in the trailer were hers, even though all of the items were found in the room where the Petitioner stayed.

The Petitioner testified that Counsel failed to adequately investigate his witness, Hale, in preparation for trial. He said he told Counsel that Hale would claim all of the items. The Petitioner recalled that Counsel told him he spoke with Hale, and Hale told him that the Petitioner had threatened to kill her. The Petitioner said he knew that this was a lie because Hale told the Petitioner she had never spoken with Counsel. The Petitioner denied ever threatening Hale or telling her that she "better not turn state's evidence." The Petitioner denied living in the trailer but was present on the night of the search.

The Petitioner testified that a subpoena was issued requiring Hale's appearance to testify at the motion for new trial hearing. When the Petitioner asked Counsel about Hale testifying, Counsel told him he would not be calling Hale to testify but instead would be relying on her affidavit. The Petitioner said that Counsel provided no explanation as to his

reliance on the affidavit rather than presenting testimony from Hale.

The Petitioner testified that when Investigator Cox testified at trial, he referenced Sergeant Lanzilotta's previous testimony during the trial, which indicated that the witnesses had spoken to each other outside of court. The Petitioner said that he did not raise this issue with Counsel but that Counsel should have "struck his testimony, or - - and had him impeached."

On cross-examination, the Petitioner admitted that he had no personal knowledge of what was said outside of court during the alleged conversations, but he inferred that there were conversations based on Investigator Cox's reference to Deputy Lanzilotta's testimony at trial. The Petitioner agreed that he was unaware that the State was allowed to designate a witness to remain present in the courtroom during the trial. He said that he could not recall whether Investigator Cox was seated at the State's table throughout the trial.

The Petitioner testified that the affidavit presented at the motion for new trial hearing was drafted by Counsel and signed by Hale. The Petitioner said that he never objected when Counsel told him he planned to rely on the affidavit but said that he told Counsel he wanted Hale to testify.

The Petitioner maintained that he never threatened Hale and had no knowledge of the methamphetamine found in the trailer. The Petitioner admitted that he had previous convictions related to methamphetamine and knew how to make methamphetamine. The Petitioner admitted to spending the night at the trailer "on occasion" and keeping clothes and work equipment in the trailer. The Petitioner said he was unaware of the specific location of the work equipment in the trailer because his workers would store the equipment in the trailer. He said that "several guys" that worked for him "stayed there." The Petitioner maintained that he was unaware that methamphetamine was being made in the trailer.

Counsel testified that, in March 2009, he represented the Petitioner in a trial on the charge of initiation of methamphetamine. Throughout the course of his representation, Counsel said that he and the Petitioner had "very limited conversations." He described the Petitioner as "reluctant" or "unable to meet" to discuss the case as often as Counsel would have preferred. His notes indicated numerous letters sent to the Petitioner to notify him of an impending court appearance and requesting a meeting to discuss the case. The Petitioner, however, was "for whatever reason . . . unable" to meet with Counsel.

Counsel said that he reviewed Hale's two statements to police in the discovery materials. She gave one of the statements around the time of her arrest in June 2008, and she provided the second statement in March 2009. Both statements denied ownership of the drug

materials.

Counsel testified that, through court records, he learned that Hale had filed a pretrial diversion application and, closer to the trial date, that she had entered a guilty plea. Upon seeing her entry of a guilty plea, Counsel made contact with Hale to see if she was willing to provide any information that would assist in the defense of the Petitioner at trial. An investigator met with Hale shortly before the Petitioner's trial, and Hale said she did not want to testify. Hale said that the Petitioner lived in the Lynch Road trailer and that the items found were the Petitioner's items. Hale told the investigator that the Petitioner threatened to kill her, so it was better for her not to testify.

Counsel testified that he told the Petitioner that Hale would not testify. He explained that he had a meeting scheduled with the Petitioner on Tuesday afternoon before the trial, and the Petitioner never showed up. The Petitioner failed to meet Counsel at his office on Wednesday and was late to court on Thursday. When Counsel was finally able to meet with Counsel on Thursday in court, he told the Petitioner that Hale would not testify. Counsel said that the Petitioner appeared to understand that Hale would assert her Fifth Amendment privilege or would not testify favorably. Counsel said that the Petitioner did not "insist" he call Hale to testify, but, if he had, Counsel would have advised against it based on credibility concerns.

Counsel testified that, after the jury convicted the Petitioner but before the hearing on the motion for new trial, he saw Hale in general sessions court and she "gave [him] the impression that she would be willing to sign an affidavit or testify at the motion for new trial hearing." Counsel identified Hale's affidavit that he had submitted during the motion for new trial hearing. Additionally, he had Hale served in jail with a subpoena for the motion for new trial hearing. Counsel and the Petitioner discussed whether or not to have Hale testify at the motion hearing and decided to rely on the affidavit. If Hale testified, Counsel explained, he believed the trial court would not find her credible based on her multiple prior statements, criminal history, and current status. He said that submitting her statement by affidavit was "the best way" to address the credibility issue. Counsel testified that, furthermore, if the trial court denied the motion, he believed that the affidavit would be better support on appeal than live testimony.

Counsel testified that the State filed a motion *in limine* requesting that the trial court limit any reference to Hale and her conviction during the trial. Counsel said that Investigator Casey Cox was the State's designated representative during the trial and sat at the State's table. He agreed that, as the State's designated representative, Investigator Cox was not subject to the rule excluding all witnesses from sitting in court during testimony.

On cross-examination, Counsel testified that the Petitioner was out of jail on bond pending trial "for most of the time." He explained that the Petitioner was arrested "a time or two" and was incarcerated before making a "new bond." Counsel agreed that he met with the Petitioner twice at his office in preparation for trial: (1) when the Petitioner retained Counsel; and (2) four or five days before trial.

Based on this evidence, the post-conviction court denied the Petitioner post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that he received the ineffective assistance of counsel. Specifically, he asserts that Counsel failed to: (1) call Hale as an exculpatory witness at trial and at the motion for new trial hearing; and (2) failed to object to a violation of the sequestration rule "as regards to Investigator Casey Cox and Sergeant Lanzilotta." The State responds that the Petitioner has failed to prove his allegations by clear and convincing evidence and that, therefore, the post-conviction court should be affirmed. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient.

This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House*, 44 S.W.3d at 515 (quoting *Goad,* 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard,

then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Witness Hale

The Petitioner claims that Counsel was ineffective for failing to call Hale to testify in his defense at trial. The post-conviction court, in denying the petition, credited Counsel's testimony that Hale refused to testify. Counsel said that Hale told his investigator that she would not testify and that the drugs and drug-related items belonged to the Petitioner. The post-conviction court noted Hale's affidavit for police, in which it she stated she would not testify at the Petitioner's trial. The post-conviction court did not credit Hale's testimony at the post-conviction hearing that she merely failed to mark through the sentence indicating she was not willing to testify when she had made other corrections throughout the affidavit.

The evidence does not preponderate against the post-conviction court's findings. Once Hale had settled the charges stemming from this same incident, Counsel sent an investigator to talk with Hale. Hale told the investigator that she would not testify on the Petitioner's behalf at trial. Further, the police affidavit indicated that Hale would not testify at the Petitioner's trial. Counsel also stated concern about Hale's credibility as a witness at trial. These concerns are well-founded in light of Hale's criminal history, incarceration at the time of trial, and prior statements to police that were inconsistent with what the Petitioner asserted she would say at trial. Considering all of these factors, Counsel made an informed, strategic decision not to call Hale to testify at the Petitioner's trial. We can not conclude that Counsel's performance was deficient or that Counsel's failure to call Hale prejudiced the Petitioner at trial. The Petitioner is not entitled to relief.

We now consider the Petitioner's argument that Counsel was deficient for failing to call Hale to testify at the motion for new trial hearing. In its written order, the trial court stated that it did not find Hale credible. Further, in its oral ruling, it recalled stating reservations regarding Hale's credibility as it pertained to the affidavit at the motion for new trial. The trial court concluded that Counsel was not deficient for submitting the affidavit rather than live testimony.

The evidence in the record does not preponderate against the trial court's factual findings in this respect. As earlier noted, Hale was charged for these crimes as well and had pled guilty to her charges before the Petitioner's trial. She had made inculpatory statements regarding the Petitioner in two statements provided to police. Counsel prepared an affidavit

-11-

of Hale's statement and served Hale with a subpoena for the motion for new trial hearing. After discussing the options with the Petitioner, Counsel and the Petitioner decided on a course of action that provided less opportunity for the State to attack Hale's credibility. Based on the record, Counsel made an informed decision to present Hale's testimony by affidavit rather than live testimony. We can not conclude that Counsel was deficient in this respect or that the Petitioner was prejudiced. The Petitioner is not entitled to relief.

## B. Investigator Cox

The Petitioner argues that Counsel failed to notify the trial court of a violation of the sequestration rule, Tennessee Rule of Evidence 615. The post-conviction court made the following findings as to this issue:

> Mr. Cox was designated as the prosecuting witness. The State has a witness to be here in the trial of a case, and he did hear, I suppose, the testimony of the other witnesses. But the mere fact that he reiterated what Mr. Lanzilotta said in his testimony does not mean that there was some collaboration in violation of the rule.

In the Petitioner's brief, he includes the following trial testimony:

Question:    Were you able to see in the mobile home at various times during the evening before the search warrant was executed?

Witness:     Yes, sir. I seen, as Sergeant Lanziolotta explained in his view that he was going in the trailer, that was my limit to my view of the trailer, was just inside the door. If the door come open, I could see something. If the door was shut, I didn't see anything.

The Petitioner, however, failed to include a transcript of the trial in the record on appeal. It is the Petitioner's duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal." Tenn. R. App. P. 24(b). Nonetheless, this Court may take judicial notice of the direct appeal record. *See State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964). Despite the Petitioner's error, we choose to take judicial notice of the direct appeal record for purposes of the current appeal.

Tennessee Rule of Evidence 615 provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory

hearing." The rule, however, does not authorize the exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Tenn. R. Evid. 615.

It appears that the Petitioner's argument in his brief is that Counsel should have objected to Investigator Cox's reference to Sergeant Lanzilotta's testimony based upon the sequestration rule. Investigator Cox, however, was properly in court during the testimony as the State's designated witness or representative. At the post-conviction hearing, the Petitioner testified as to this issue, apparently alleging that Investigator Cox's reference to Sergeant Lanzilotta's testimony indicated that Investigator Cox and Sergeant Lanzilotta spoke about the testimony outside of court. The mere fact that Investigator Cox referenced Sergeant Lanzilotta's testimony, which he heard in court as the designated witness, does not prove by clear and convincing evidence that Investigator Cox and Sergeant Lanzilotta engaged in out-of-court discussions about the case during the trial.

Finally, we note, as the State did in its brief, that although not raised by the Petitioner, Investigator Cox, as the State's designated witness at trial, should have testified first. Our review of the trial transcript indicates that Investigator Cox was the next witness to testify after Sergeant Lanzilotta. When a prosecutor designates an investigating officer, that officer should testify first at trial to comply with the purpose of the rule, which is to prevent one witness from hearing the testimony of another and adjusting his testimony accordingly. *Mothershed v. State*, 578 S.W.2d 96, 100-01 (Tenn. Crim. App. 1978). When this occurs, a defendant must show that a witness improperly changed his or her testimony after hearing other witnesses testify. *State v. Sexton*, 724 S.W.2d 371, 374 (Tenn. Crim. App. 1986).

The Petitioner has failed to show that Investigator Cox improperly changed his testimony after hearing Sergeant Lanzilotta's testimony. Investigator Cox testified regarding his view of the inside of the trailer from his surveillance position as consistent with Sergeant Lanzilotta's testimony. Cox testified that he could not see inside the trailer until Sergeant Lanzilotta opened the trailer door. Sergeant Lanzilotta testified as to his view before entering the trailer as follows:

> Q:    Now, were you situated where you could see inside the mobile home
>        before you entered the mobile home?
>
> A:    That's incorrect, I was not.
>
> Q:    So when it came time to enter, that's the first time you actually had a
>        good view of the mobile home; correct?

A:  Yes, sir, that's correct.

Q:  Could you see this - - bedroom, or this area that you were instructed to go into before you entered the mobile home?

A:  No, sir.

Q:  Could you see other areas of the mobile home, like the living room, or the wide area there where the TV is identified?

A:  No, sir.

The Petitioner offers no explanation as to how both officers testifying that they could not see inside the trailer until the time of the execution of the search warrant and their actual entrance into the trailer prejudiced him. Based on the officers' inability to see inside the trailer prior to entry, neither officer offered any testimony, incriminating or otherwise, as to the activity in the trailer in the few minutes leading up to police entry. Further, the Petitioner does not point out, nor are we able to find any indication that Investigator Cox improperly altered his testimony based on the testimony of Sergeant Lanzilotta. Accordingly, we conclude that the Petitioner has not shown that he was prejudiced by Counsel's failure to object to Investigator Cox not testifying first at trial.

## II. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the post-conviction court properly denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE

-14-